ZUCCARO, Justice,
for the Court:
On March 14, 1983, Jane Sacco, daughter of Fannye Gordon, deceased, filed a complaint in the Chancery Court of Quitman County in her capacity as administratrix of her mother’s estate. Named as defendants were Jim Cleve Gordon, Sarah Gordon Morrison and John Steve Gordon, with Jim being sued both individually and in his capacity as executor of the estate of S.T. Gordon, deceased. In that complaint Sacco sought 1) to set aside conveyances of her life estate in certain property to S.T.’s children and to recover the fair market rental on said properties from the date of conveyance of her life estate to her death, and 2) to recover certain money which Fannye had given to the estate. After a trial on the merits, the chancellor entered judgment for the defendants. From that judgment Sacco appeals, arguing that the chancellor erred in failing to find 1) that Fannye Gordon was in a confidential relationship with Jim Cleve Gordon (her step-son and executor of her late husband’s estate), and 2) that Fannye Gordon was in a confidential relationship with Walter Dreadpn, attorney for the estate of her late husband. We affirm.
FACTS
In 1971, two years after the death of his first wife, S.T. Gordon married Fannye, the cousin of his late first wife. Although Fannye had lived in West Virginia for many years, she moved, at the time of the marriage, to S.T.’s home in Sledge, Mississippi.
When she married S.T., Fannye had three grown children from her first marriage. One of them, Jane Sacco of Morgan-town, West Virginia, is the plaintiff/appellant in the case at bar. S.T. also had three grown children, who are the defend *907 ants/appellees in the instant case: Jim Cleve Gordon, John Gordon, and Sarah Jane Gordon Morrison. Jim and John lived in Sledge, where they were partners with their father in a farming operation. Sarah lived in Jackson, Mississippi.
Fannye and S.T. each brought into the marriage certain individually accumulated assets. Among S.T.’s possessions were approximately 1200 acres of farm land and his residence. Fannye, who had managed a university bookstore in West Virginia, brought into the marriage personal property including an automobile, and funds from the sale of a mobile home she had been purchasing. At trial several witnesses, including Jim Gordon and Fannye’s first cousin S.R. Starr, testified that Fannye and S.T. had agreed, at the time of the marriage, that the individual property of each would ultimately go to that partner’s children. Upon S.T.’s death, his children would receive the assets he had accumulated. Similarly, upon Fannye’s death, her children would receive her individual assets. Apparently, this agreement was oral.
Fannye and S.T. made their home in Sledge, where S.T. continued the farming operation he had owned for many years. In 1976, he retired, and his two sons, who were also his partners, took over the farming business.
Over the years, Fannye and S.T. both had health problems. Fannye suffered from emphysema and lung cancer, the latter of which was treated with radiation. S.T.’s primary health problem was alcoholism, for which he was hospitalized several times during the marriage.
S.T. died testate on May 25, 1982. The pertinent provisions of his will were as follows:
1) S.T.’s son, Jim Cleve Gordon, was to serve as executor.
2) Fannye was to own the residence, its furnishings and the farmland for life or until she remarried.
3) The remainder interest in the residence and farmland was to go to Jim, John and Sarah in equal shares.
4) During Fannye’s lifetime, she was to rent the farmland to Jim and John who were to pay her “a fair, just and equitable [rent] ... for the purpose of providing an adequate and sufficient income for her based on [Fannye’s and S.T.’s] status of living at the tipie of [S.T.’s] death.”
5)The residuary legatees were Sarah, John and Jim.
The total value of the residence and the farmland was reported on the estate tax return as $232,900.00. Also listed as assets of the estate were notes totaling $154,-644.00. Most of the notes were from S.T.’s three children for land they had purchased from him. S.T. also had, at the time of his death, $108,000.00 in certificates of deposit, which he held jointly with Fannye. Upon his death they passed to Fannye by right of survivorship.
After S.T.’s death, his children were surprised to learn that the $108,000.00 had passed to Fannye by right of survivorship. They believed the certificates were purchased with their father’s money and that he would want his children to have those funds. They contacted Walter Dreaden, who had been S.T.’s attorney and who was attorney for the estate. They asked Dreaden whether ownership of the certificates could be changed, and he informed them that the certificates were Fannye’s.
The concern which S.T.’s children had about the certificates increased when they learned that the inheritance taxes on their father’s estate amounted to $51,273.00. Although the value of the estate exceeded $300,000.00, the assets consisted primarily of land and the notes which S.T.’s children owed to him upon his death. Thus, there was no cash available with which to pay the inheritance tax.
Fannye had told S.T. that, should he predecease her, she would return to West Virginia, where she had lived before their marriage. In mid-September of 1982, Fannye indeed moved to West Virginia.
In the four months between S.T.’s death and Fannye’s return to West Virginia, Fan-nye visited three or four times in the offices of Walter Dreaden, attorney for the estate. (Although Dreaden died before tri *908 al, his deposition was admitted into evidence.) These visits lasted approximately fifteen minutes each. The purpose of them was, in Walter Dreaden’s words, for Fan-nye to “check on the progress” of the estate. At one of these meetings, Dreaden told Fannye “that the accounting firm had received the inventory ... and that they were working on the tax return [and] that in all probability there would be tax due.” Fannye “asked about that.” Dreaden told her he “had no knowledge of any money in the estate with which to pay the taxes.” When Fannye asked how the taxes would be paid, Dreaden told her the personal property would be taken first and then the land, or that money could be borrowed against the land to pay the taxes. Dreaden testified that he had explained to Fannye that the notes which the children owed the estate were personal property and that they therefore would be used to pay taxes before the real estate would be taken.
At a later visit to Dreaden’s office, Fan-nye, according to Dreaden’s testimony, made the statement that the certificates of deposit were “S.T.’s money,” and she asked whether she could put those funds back into the estate for the purpose of paying the taxes and expenses of the estate. He told her she could do so. Dreaden also testified that Fannye told him, “I love these children like I love my own, and I know that S.T. wouldn’t want to see anything happen other than what I am thinking about doing, what I want to do here.”
After learning of Fannye’s desire to help with the taxes and expenses of the estate, Dreaden informed S.T.’s children of Fan-nye’s wishes. In early September, Jim Cleve Gordon, heard “through the grapevine” that Fannye’s daughter Jane Sacco was coming to take Fannye to West Virginia. After learning that Fannye’s departure was imminent, Jim called Dreaden and told him, according to Jim's testimony, “that Jane was coming, and that Fannye was leaving, and anything that needed to be done with the estate needed to be done.”
Although Jim claimed at trial that he was referring to “paperwork, such as petitions,” the result of his phone call was that Dreaden arranged a meeting at the local bank on September 9, 1982. Attending were Fannye, Jim, Dreaden, and Billy Wilder, the estate accountant. At that meeting, Fannye executed a deed conveying her life estate in the residence to S.T.’s children. She also cashed in her $108,000.00 certificate of deposit and wrote a $100,-000.00 check to the estate, keeping $8,000.00 for moving expenses. $60,000.00 of the $100,000.00 was retained by the estate to pay taxes and expenses. The remaining $40,000.00 was divided among Fannye and the three Gordon children. Each of the Gordon children received $12,-000.00, while Fannye, who had kept $8,000.00 of the original $108,000.00, received $4,000.00.
Jim Cleve Gordon and Walter Dreaden both testified that these transactions were initiated by Fannye and that they were her idea. Sacco, of course, argues on appeal, as she did at trial, that the transactions resulted from undue influence.
Fannye died in West Virginia on February 3, 1983, of an infection of the brain. On March 14, 1983, Sacco filed suit, seeking to recover 1) $96,000.00 which the estate and the children had received from the $108,000.00 certificate of deposit and 2) the fair rental value of her life estate from the date of the deed until the date of Fannye’s death. The grounds on which Sacco sought to recover were undue influence and lack of mental capacity. After a trial on the merits, the chancellor concluded 1) that Fannye possessed the requisite mental capacity to make the conveyances, 2) that the Gordon children were not in a confidential relationship with Fannye, and 3) that Walter Dreaden never acted as Fannye’s attorney and therefore was not in a confidential relationship with her. From a judgment for the defendants, Sacco appeals. Abandoning all other arguments on appeal, Sacco claims only that the trial court erred in failing to find a confidential relationship giving rise to the presumption of undue influence.
DID THE TRIAL COURT ERR IN FAILING TO FIND A CONFIDENTIAL RELATIONSHIP?
Sacco actually argues that two confidential relationships existed: 1) between Fan- *909 nye and Jim Cleve Gordon, who was executor of her late husband’s estate, and 2) between Fannye and Walter Dreaden, who was the attorney for her late husband’s estate and who was, according to Sacco’s argument, Fannye’s attorney. The essence of Sacco’s argument is that each of these relationships was, as a matter of law, confidential, and that each therefore gave rise to the presumption of undue influence. The trial court, however, found no confidential relationship and therefore found no presumption of undue influence. Moreover, the trial court found that Dreaden was not in an attorney/client relationship with Fannye.
In Costello v. Hall, 506 So.2d 293 (Miss. 1987), we considered “whether a power of attorney creates a confidential relationship as a matter of law” and concluded that it did not. 506 So.2d at 297. Regarding confidential relationships, we stated the following:
The cases in which we have recognized the presumption of undue influence present factual scenarios where that was more than just a legal or domestic relationship between the [testator/grantor] and the [beneficiary/grantee]. There must also be an abuse of that relationship relating to the execution of the [will/deed].
[[Image here]]
Furthermore, even when a confidential relationship can be said to exist between the parties ..., the [beneficiary/grantee] must have used that relationship for his personal gain or to thwart the intent of the [testator/grantor].
Costello, 506 So.2d 298.
The record in the instant case contains absolutely no evidence of overreaching. In his findings of fact the chancellor concluded that there was no relationship of confidence or dependence between Fannye and either Dreaden or the Gordon children. Nor can we agree with Sacco’s argument that the executor of an estate and the attorney for that estate are in such relationships with the beneficiary of the estate that the presumption of undue influence arises, as a matter of law, in transactions between such persons. Indeed, as we held in Costello, “[t]he cases in which we have recognized the presumption of undue influence present factual scenarios where there was more than just a legal or domestic relationship between the [parties to the transaction]”. 506 So.2d at 298 (providing that there must be an abuse of the relationship before the presumption arises).
Because the chancellor correctly found that there was no confidential relationship and that the presumption of undue influence therefore did not arise, we affirm the judgment.
AFFIRMED.
ROY NOBLE LEE, C.J., HAWKINS and DAN M. LEE, P.JJ., and PRATHER, ROBERTSON, SULLIVAN, ANDERSON and GRIFFIN, JJ., concur.